**CITY OF FORT WORTH, Petitioner,**

v.

**Mary Elizabeth CORBIN et al., Respondents.**

No. B–3956.

Supreme Court of Texas.

Jan. 16, 1974.

Rehearing Denied Feb. 20, 1974.

S. G. Johndroe, Jr., City Atty., Jerome H. Parker, Jr., Asst. City Atty., Fort Worth, for petitioner.

Kelsey & Wood, Richard H. Kelsey, Denton, Handy, Hill & Morgan, Inc., James R. Handy, Hurst, for respondents.

REAVLEY, Justice.

This is a condemnation case. The question: at what time does the landowners' compensation cease to benefit from the rise of area land values due to the very project for which their land is being taken? The trial court and Court of Civil Appeals have allowed the jury to value the condemned land by including enhancement due to the new facility until that date when the landowners are given personal notice that their land is to be included in the project. 491 S.W.2d 468. We hold this to be error, because it allows the compensation to exceed

the standard of the fair market value of the property at its taking. The case must be remanded for a new trial.

The cities of Dallas and Fort Worth have constructed the Dallas/Fort Worth Regional Airport upon an area in excess of 18,000 acres located between the two cities and near the town of Grapevine. Mr. and Mrs. W. Boyd Corbin and their daughter, Mary Elizabeth Corbin, are residents of Grapevine and own the acreage which is being taken by the City of Fort Worth in this proceeding. Mary Elizabeth Corbin owns 10 acres and Mr. and Mrs. W. Boyd Corbin own 4.834 acres. The two separate tracts are adjacent and in all respects alike —unimproved and fronting upon a small hardtop road some three miles east of Grapevine.

## CHRONOLOGY OF EVENTS

1. On September 27, 1965 the cities of Dallas and Fort Worth signed a contract providing for interim steps to be taken toward the construction of a regional airport. The plan at that time was to create a separate governmental entity: the North Central Texas Airport Authority. The Texas Constitution was subsequently amended and a statute enacted to make this possible. The plan was halted on June 16, 1967 when a prerequisite election in Dallas County defeated the proposition.

2. On April 15, 1968 the two cities executed a new contract providing that the regional airport was to be constructed by the joint effort of the cities without the creation of a separate governmental authority. The cities agreed to assign to the Dallas/Fort Worth Regional Airport Board the tasks of planning and operation of the airport.

3. On September 27, 1968 the Dallas/Fort Worth Regional Airport Board formally adopted and approved its "Over-All Preliminary Plan for Construction of the Dallas/Fort Worth Regional Airport." This plan includes maps as appendices which clearly delineate the boundaries of the airport. These maps locate existing artificial and natural monuments in the area, and it can be educed from the maps that the Corbin tracts are located in the northern area of the proposed airport and at least 3,000 feet from the nearest boundary.

4. On September 30, 1968 the City Council of the City of Fort Worth adopted an ordinance or resolution approving the plan which had been adopted by the Airport Board three days earlier. The City Council thereby found and determined the land enclosed within the boundaries of the airport as reflected on the maps in the Board's plan to be "needed for essential public airport and essential governmental purposes." The Airport Board was authorized to proceed with the construction and operation of the airport in accordance with the September 27 plan.

5. On October 27, 1969 the first direct communication from the Board or City Council to these landowners came by mail advising the owners that their land would be condemned if a suitable price could not be agreed upon.

6. The petition in condemnation was filed on October 28, 1970. The commissioners heard the matter on November 19, 1970 and entered awards based on the valuation of $4,000 an acre. The landowners filed their objection to the awards.

7. On December 8, 1970 the amount of the award was deposited by the City of Fort Worth. This is the date of taking.

During the course of this litigation some contention has been made on the part of the City that all enhancement due to the anticipated construction of the airport should be excluded from the compensation due the landowner, and on the part of the landowners it has been contended that no restriction should be imposed but full enhancement allowed up to the date of taking on December 8, 1970. These contentions are not seriously advanced here; the real argument is over the choice between the

events that occurred on September 30, 1968 and on October 27, 1969. The City contends that the approval of the plan and maps on that date in 1968 made it definite that the Corbin tracts would be taken for the airport and that no enhancement in value due to the construction of the airport should be allowed thereafter. The landowners contend that they should not be charged with notice of the designation for taking of their land until their letters of October 27, 1969 and that enhancement in the value of the land because of the airport should be allowed until that date.

The lower courts have agreed with the landowners upon this date in 1969 for the cutoff point, while the City has insisted upon its 1968 date and preserved its position throughout the litigation. In advance of trial the City filed a motion to suppress any evidence as to increase in market value of the land, due to the location or construction of the proposed airport, which accrued after September 30, 1968. The City requested the trial court to instruct the jury to exclude any increase in the value for this purpose after that date, and it objected to the court's charge which excluded enhancement in value "after October 27, 1969, due solely to the announcement, location, design, construction or operation of the airport."

The City also offered expert opinion testimony of value without project enhancement after September 30, 1968 but the testimony was ruled inadmissible. The City's witnesses were only allowed to testify before the jury that the land being taken was valued at $5,000 an acre if project enhancement due to the airport were not excluded until after October 27, 1969; they testified outside the hearing of the jury upon offer of proof that if the cutoff date on project enhancement was September 30, 1968, their opinion of the value of the land would be $2500 or $2750 an acre. The testimony of the landowners' expert witnesses was that the value of the land on December 8, 1970, the date of the taking, ranged from $6,000 an acre to $10,000 an acre.

Evidence of comparable sales were given to support each of these valuations by the expert witnesses. The jury put the value at $6,000 an acre.

■■ The compensation for land taken by eminent domain is measured by the market value of the land at the time of the taking. This is the date upon which the condemnor lawfully takes actual possession or, as in the present case, takes constructively by a deposit of the special commissioners' award. *See,* Tex.Const., Art. I, § 17, Vernon's Ann.St.; Article 3268, Vernon's Civ.Stat.Ann.; Fuller v. State, 461 S.W.2d 595 (Tex.1970); Aycock v. Houston Lighting & Power Co., 175 S.W.2d 710 (Tex.Civ.App.1943, writ ref'd w. o. m.); Tarrant County Water Control and Improvement Dist. No. 1 v. Fowler, 175 S. W.2d 694 (Tex.Civ.App.1943), writ ref'd w. o. m., 142 Tex. 375, 179 S.W.2d 250, 1944); Alexander v. City of San Antonio, 468 S. W.2d 797 (Tex.1971). There is no disagreement about these standards. Nor is there any doubt about the proposition that the landowners' compensation should under some circumstances or at some time cease to include enhancement due to the project which is itself the purpose of condemnation. *See,* City of El Paso v. Coffin, 40 Tex.Civ.App. 54, 88 S.W. 502 (Tex.Civ. App.1905, writ dism'd; 4 Nichols on Eminent Domain (3d ed. 1962) § 12.3151; Anno.: 147 A.L.R. 66 (1943).

■ In determining the landowner's just compensation for what is taken from him, the fact finder is entitled to consider every factor affecting the price which the prudent and willing buyer and seller would exchange for the property. Some realities, however, must be excluded from the computation, which means that the exercise becomes to some extent hypothetical. The willingness and ability of buyer and seller are assumed. The fact of condemnation itself is excluded; fair market value must, by definition, be computed as if there were no proceedings to eliminate that market. By virtue of the hypothetical exercise, the

courts could add an increment of project enhancement to the market up to the time of taking by simply decreeing it. To do so would add an artificial increment and place the landowner in a better position than he would have enjoyed had there been no construction or condemnation. The objective of the judicial process under the constitution and statutes is to make the landowner whole and to award him only what he could have obtained for his land in a free market.

When it becomes known to prospective purchasers that the landowner's entire tract will soon lie beneath a highway or airport, the market should thereafter allow no benefit for that land because of that project. 1 Orgel, Valuation under Eminent Domain § 98 (1953). Suppose that Jones owns ten acres across the street from a great new intercontinental jetport and that Brown owned ten acres which becomes the site for the jetport's entrance; it is good fortune and an incident of ownership at the right place that enrich Jones. The condemning authority is not required to match Jones' good fortune for Brown. The authority needs only to compensate Brown for the market value of his land, and that market at some point ceased to enjoy the same prospects as did Jones' land. This was a known fact among those who buy and sell property from the time the condemning authority announced its intention to include Brown's land and exclude the land of Jones.

Sales of land located outside the airport may be admissible under a proper exercise of the trial court's discretion, but dissimilarity of location and market is significant; the expert appraiser must be required to recognize this fact in estimating market value of the taken land and the jury should not be allowed to conclude otherwise. It was at this point of comparable sales and the measurement of value based thereupon that the errors of this trial had the most damaging effect upon the verdict and judgment.

■ The date upon which the market no longer allows project enhancement is delineated by variant tests. In some jurisdictions the landowner is entitled to recover project enhancement only until his property is probably within the scope of the project. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Merced Irrigation District v. Woolstenhulme, 4 Cal.3d 478, 93 Cal.Rptr. 833, 483 P.2d 1 (1971). More is required under Texas law: enhancement is allowed up to the time that the condemnor manifests a definite purpose to take the particular land. Fuller v. State, 461 S.W.2d 595 (Tex. 1970); Barshop v. City of Houston, 442 S.W.2d 682 (Tex.1969); City of Dallas v. Shackelford, 145 Tex. 528, 199 S.W.2d 503 (1947); Trinity River Authority v. Boone, 454 S.W.2d 258 (Tex.Civ.App.1970, no writ); Note, 48 Texas L.Rev. 1389 (1970). The manifestation or announcement must be done or made publicly and be of sufficient notoriety to insure that a person in the business of trading land in the vicinity, or a prospective purchaser of ordinary prudence, by making a reasonable effort to gain information on the uses and value of the land will either know of the inclusion of the land within the project or will be aware of the need for inquiry at a convenient source where the fact will be readily obtainable.

■ The determination of the cutoff date for project enhancement must be made by the court and not by the jury. That ruling must often precede the determination of comparability of sales as well as the admissibility of other evidence, which are matters for the judge to decide. *See* State v. Oakley, 163 Tex. 463, 356 S. W.2d 909 (1962). When the proper legal rule is applied to the evidence in the present case, it cannot be ruled that the value of the Corbin land was affected by the proposed airport until October 27, 1969. All of the evidence establishes conclusively that the Corbin land was designated by the City of Fort Worth on September 30, 1968

to be taken for the new airport. Maps were circulated among the realtors and in the newspaper, and they were available at City offices. There was never any uncertainty thereafter as to whether all of the Corbin land would be taken for that purpose. The Corbins did not have personal notice of this fact, but they made no claim to the slightest knowledge about the airport or market in land. Two of the witnesses for the landowners testified that the airport location "floated" for a time; they did not testify that there was any uncertainty after September 30, 1968 as to whether the Corbin land would be taken for the airport.

The judgment of the Court of Civil Appeals is reversed and the case is remanded to the trial court for new trial.

JOHNSON, J., concurs in the result.

McGEE, J., notes his dissent.